Lulu I. MELVILLE, Petitioner,

v.

Stanton C. SOUTHWARD, Respondent.

No. 89SC39.

Supreme Court of Colorado,
En Banc.

May 14, 1990.
Rehearing Denied May 29, 1990.

**384**

Robert A. Millman, P.C., Robert A. Millman, Colorado Springs, for petitioner.

Hall & Evans, Duncan W. Cameron, Denver, for respondent.

Chief Justice QUINN delivered the Opinion of the Court.

The question in this case is whether a plaintiff in a medical malpractice action against a podiatrist, who performed foot surgery and rendered post-operative care and treatment to the plaintiff, may elicit expert opinion testimony from a practitioner of another school of medicine, namely orthopedic surgery, on the standard of care applicable to podiatric surgery and post-operative care and treatment. The trial court permitted the plaintiff, over the defendant's objection, to elicit an expert opinion from an orthopedic surgeon that the podiatric surgery performed on the plaintiff's foot and the post-operative treatment rendered to the plaintiff fell below the standard of care applicable to the surgery in question and also fell below the standard of care applicable to the post-operative care and treatment of the patient. The court of appeals, in an unpublished opinion, reversed the judgment entered on the jury verdict for the plaintiff and ordered the dismissal of the plaintiff's complaint with prejudice, reasoning that the testimony of the orthopedic surgeon was insufficient as a matter of law to establish a *prima facie* case of negligence against the podiatrist. *Melville v. Southward,* No. 86CA1029 (Colo.App. Nov. 25, 1988). We agree with the court of appeals that the lack of any foundation for the orthopedic surgeon's familiarity with the podiatric standard of care

for the surgery in question and the post-operative care and treatment of the patient rendered the orthopedic surgeon's opinion testimony inadmissible. However, contrary to the court of appeals' decision, we believe that the proper disposition of this matter is to return the case to the trial court for a new trial.

### I.

The plaintiff-petitioner, Lulu Melville (plaintiff), filed a negligence action in the district court of Fremont County against the defendant-respondent, Dr. Stanton C. Southward (defendant), a licensed podiatrist. The complaint, as pertinent here, alleged that on or about August 14, 1980, the defendant performed a surgical procedure in his office on the plaintiff's right foot, that the surgical procedure fell below the standard of reasonably careful podiatric surgery, that defendant failed to provide adequate post-operative care and treatment, and that the plaintiff sustained a serious infection and developed osteomyelitis as a result of defendant's negligence. The defendant denied the allegations of negligence and asserted that any injury suffered by the plaintiff was a result of her own negligence.

The case proceeded to a jury trial on May 27, 1986, at which the defendant represented himself. The evidence at trial established the following sequence of events. The plaintiff first consulted the defendant in July 1980 for an ingrown toenail. The defendant removed the ingrown toenail and subsequently, on August 14, 1980, recommended that plaintiff undergo a surgical procedure known as a metatarsal osteotomy in order to relieve the discomfort that the plaintiff had been experiencing. The recommended surgery consisted of the cutting and shortening of the metatarsal shaft of the second toe in the right foot.

The plaintiff agreed to the surgery, and it was performed on August 14 in the defendant's office. The defendant applied a local anesthesia to the plaintiff's foot and made a minimal incision, about a quarter-inch wide, through the top of the foot and

then used a drill to fracture the metatarsal shaft and a dental burr to remove any bone fragments. After completing the surgery, he instructed the plaintiff to soak her foot in vinegar and water. The defendant wrapped the foot in a Unna boot, which basically is an ace bandage soaked in an antibiotic, placed plaintiff's foot in a half shoe, and provided the plaintiff with a pamphlet containing post-operative instructions.

The plaintiff returned home after the surgery and resumed her usual activities, which consisted primarily of gardening. She wore the half shoe, soaked her foot daily as directed, and returned to the defendant's office approximately one week later for a check-up. Upon examining the foot the defendant commented, "I don't like the looks of this," and then medicated and rewrapped the foot and provided the plaintiff with an antibiotic medication.

On August 26, 1980, the plaintiff telephoned the defendant and complained that her foot was swollen, red, and quite painful. The defendant advised her to increase the amount of vinegar in the prescribed solution and to soak the foot more frequently, and stated that he would check the foot again in two days at the plaintiff's scheduled office appointment. The defendant, at the scheduled office visit, told the plaintiff that her foot was healing, and he rewrapped the foot with clean bandages. The next day, August 29, the plaintiff noticed a sore spot near the surgical site and a fluid exuding from that area when it was touched. The plaintiff telephoned her family physician, Joseph R. McGarry, for an appointment.

Doctor McGarry, a medical doctor, saw the plaintiff on September 3, 1980. The plaintiff told Doctor McGarry that she had undergone surgery on the foot two weeks previously and that the foot had become swollen and red and had been draining at the surgical site. Upon examination of the foot, McGarry saw that the surgical site was badly infected. McGarry instructed the plaintiff to keep her foot elevated, prescribed an antibiotic, and told her that her infection was quite serious and to return to his office for a check-up. When the plaintiff experienced more drainage from the surgical site, McGarry admitted her to a hospital for X-rays and for the administration of antibiotics intravenously. McGarry diagnosed the plaintiff's condition as a compound fracture of the second metatarsal on the right foot, with concomitant infection resulting from the surgery, and recommended that plaintiff see Doctor Michael Barnard, an orthopedic surgeon practicing in the area.

Doctor Barnard first saw the plaintiff on October 17, 1980, and noted that the plaintiff's foot was swollen and slightly red. X-rays revealed an erosion of the bone in the area of the second metatarsal. Such bone erosion, according to Barnard, was consistent with osteomyelitis which, in his view, had been caused by the osteotomy performed by the defendant.

Plaintiff's counsel asked Doctor Barnard whether he had an opinion to a reasonable medical probability on whether the osteotomy was performed below the standard of care for such a surgical procedure. The defendant objected to this line of questioning on the basis that no foundation had been laid regarding Barnard's knowledge of the standard of care applicable to podiatry. The trial court overruled the objection and permitted Barnard to testify. Barnard testified that the osteotomy performed by the defendant was below the standard of care for two reasons: first, the surgery was unnecessary because none of the pre-surgical X-rays indicated a deformity in the metatarsal; and second, even assuming the surgery was necessary, the osteotomy was performed in an unsterile office environment and thereby subjected the bone to a high risk of infection. Barnard acknowledged in his testimony that he was unfamiliar with the standards applicable to podiatric foot surgery, was not familiar with podiatric literature, had never received any instruction on podiatry, and had never performed the surgical procedure involved in this case.

Doctor Barnard also testified, again over the defendant's objection, that the defendant's post-operative treatment of the

plaintiff fell below the proper standard of care for treating an osteotomy. Barnard testified that there is a uniform physiological bone healing process for all types of bone surgeries and that proper post-operative treatment of foot surgery requires that the foot be elevated for 24 to 48 hours without weight-bearing as a means of reducing inflammation. Inflammation, according to Barnard, can cause infection. Barnard further testified that a review of the plaintiff's medical history and the defendant's notes, as well as an examination of the plaintiff's foot, revealed that the plaintiff had received inadequate post-operative treatment. Barnard based his opinion on the fact that the plaintiff's right foot had not been adequately immobilized and on the further fact that the soaking treatment provided only semi-antibiotic surface treatment of the wound and not the type of internal treatment necessary for the healing of a post-operative infection.

Doctor Barnard also testified that he performed a surgical procedure on the plaintiff's right foot on July 30, 1981, for the purpose of removing some degenerative osteophytes that had formed around the second metatarsal. It was Barnard's opinion that the plaintiff had sustained a permanent disability as a result of the defendant's surgery and would have difficulty walking and balancing herself.

At the close of the plaintiff's case, the defendant moved for a directed verdict, claiming that the plaintiff had failed to establish a *prima facie* case of negligence due to the lack of any expert testimony on the applicable standard of care for podiatric surgery and post-operative care and treatment. The trial court denied the motion, ruling that an orthopedic surgeon has more training and expertise than a podiatrist and thus is competent to provide an opinion on the standard of care applicable to the podiatric surgery performed by the defendant.

The defendant testified on his own behalf. He stated that the plaintiff had failed to follow some of his post-operative instructions and, in that respect, was responsible for some of the post-operative complications in her right foot. He also testified that the plaintiff made use of her foot more often than he had recommended and that, contrary to his instructions, she had tried to wear a full shoe. In addition, he claimed that during the post-operative period the plaintiff had bumped her foot against some object and had irritated the surgical site.

The jury found that the plaintiff had sustained damage in the amount of $56,000 as a result of the defendant's negligence. The defendant appealed to the court of appeals, contending that, because the plaintiff's only expert on the standard of care was a practicing orthopedic surgeon, the plaintiff had failed to establish a *prima facie* case of negligence. The court of appeals agreed with the defendant's argument and ordered the plaintiff's complaint dismissed with prejudice, reasoning as follows:

In this case, the testimony of the orthopedic surgeon did not purport to describe the standard of care normally observed by podiatrists. Rather, it was his testimony that the general practice of podiatrists, as a profession, did not meet the standard of care that is observed by orthopedic surgeons. That fact, however, was irrelevant to the question of defendant's professional negligence.

A patient is free to select a practitioner from any of the healing professions and, by so doing, chooses to be exposed to the kind of care and treatment recognized by that particular profession. The patient cannot later complain that the care received did not meet the standard of care exercised by the members of another profession. Thus, plaintiff here was required to present evidence on the standard of care for podiatrists, not orthopedic surgeons. Having failed to present such evidence, she failed to present a *prima facie* case.

*Melville,* No. 86CA1029, slip op. at 3. We granted the plaintiff's petition for certiorari in order to consider whether and under what circumstances an expert witness practicing one school of medicine may offer an opinion on the standard of care applicable

to another school of medicine and whether the orthopedic surgeon's expert opinion testimony was properly admitted in this case.

## II.

■ In a medical malpractice case, the burden is on the plaintiff to establish a *prima facie* case of negligence. *E.g., Maercklein v. Smith,* 129 Colo. 72, 266 P.2d 1095 (1954); *Hanley v. Spencer,* 108 Colo. 184, 115 P.2d 399 (1941). To establish a *prima facie* case, the plaintiff must establish that the defendant failed to conform to the standard of care ordinarily possessed and exercised by members of the same school of medicine practiced by the defendant. *See, e.g., Bloskas v. Murray,* 646 P.2d 907 (Colo.1982); *Dixon v. Norberg,* 113 Colo. 352, 157 P.2d 131 (1945); *Norkett v. Martin,* 63 Colo. 220, 165 P. 256 (1917); *McGraw v. Kerr,* 23 Colo.App. 163, 128 P. 870 (1912). The standard of care in a medical malpractice action is measured by whether a reasonably careful physician of the same school of medicine as the defendant would have acted in the same manner as did the defendant in treating and caring for the plaintiff. *E.g., Norkett,* 63 Colo. 220, 165 P. 256; *Jackson v. Burnham,* 20 Colo. 532, 39 P. 577 (1895).

■ Unless the subject matter of a medical malpractice action lies within the ambit of common knowledge or experience of ordinary persons, the plaintiff must establish the controlling standard of care, as well as the defendant's failure to adhere to that standard, by expert opinion testimony. *See, e.g., Bloskas,* 646 P.2d at 914; *Daly v. Lininger,* 87 Colo. 401, 406, 288 P. 633, 636 (1930); *Farrah v. Patton,* 99 Colo. 41, 44, 59 P.2d 76, 78 (1936); *Norkett,* 63 Colo. at 221, 165 P. at 257; *Jackson,* 20 Colo. at 536, 39 P. at 580; *Mudd v. Dorr,* 40 Colo. App. 74, 574 P.2d 97 (1977). The reason for the requirement of expert opinion testimony in most medical malpractice cases is obvious: matters relating to medical diagnosis and treatment ordinarily involve a level of technical knowledge and skill beyond the realm of lay knowledge and experience. Without expert opinion testimony in such cases, the trier of fact would be left with no standard at all against which to evaluate the defendant's conduct. *McGraw,* 23 Colo.App. at 172, 128 P. at 873.

■ To be distinguished from the legal standard of care applicable to a medical malpractice action is the admissibility of expert opinion testimony. CRE 702 governs the admissibility of expert testimony and states as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

As a prerequisite to admitting expert testimony, a trial court must make the following two preliminary determinations: first, the court must decide if the expert testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue; and second, the court must determine whether the witness is properly qualified by knowledge, skill, experience, training, or education, to offer an opinion on the issue in question. *See* M. Graham, *Handbook of Federal Evidence,* § 702.1, at 604–05 (1986). The text of CRE 702 is an implicit acknowledgement that the primary consideration in determining a witness' qualifications is the witness' actual "knowledge, skill, experience, training or education," rather than the particular title attributed to the witness.

The evidentiary standard for determining whether a member of one school of medicine may offer an opinion concerning the standard of care applicable to another school has been articulated by several appellate courts in various ways. One line of cases places emphasis on whether the expert witness is sufficiently knowledgeable of and familiar with the standard of care governing the defendant's specialty to offer an informed opinion on that issue. *Marshall v. Yale Podiatry Group,* 5 Conn. App. 5, 496 A.2d 529 (1985) (orthopedic surgeon qualified to testify on standard of care applicable to podiatric foot surgery

where witness was familiar with podiatric standard for treating condition in issue, performed several surgical procedures similar to those performed by podiatrist, had worked with almost all podiatrists in area, and acknowledged that orthopedic surgeons and podiatric surgeons generally perform same surgical procedures on foot); *Whitehurst v. Boehm*, 41 N.C.App. 670, 255 S.E.2d 761 (1979) ("[t]he standard of care required of a podiatrist cannot be established through testimony of an orthopedic surgeon who is not familiar with the practice of podiatry; it can only be established by the testimony of another podiatrist or one equally familiar with that field of practice"); *Botehlo v. Bycura*, 282 S.C. 578, 320 S.E.2d 59 (1984) (orthopedic surgeon not familiar with practice of podiatry not qualified to testify on standard of care applicable to podiatric foot surgery); *see Caro v. Bumpus*, 30 Colo.App. 144, 491 P.2d 606 (1971) (in malpractice action against osteopathic surgeon for negligent performance of rectal surgery, trial court properly rejected expert opinion testimony of doctors of medicine practicing proctology where expert witnesses had inadequate familiarity with osteopathic school of medicine). Another line of cases focuses primarily on whether the standard of diagnosis or treatment applicable to the expert witness' specialty is substantially identical to the standard for the defendant's practice. *E.g., Connelly v. Kortz*, 689 P.2d 728 (Colo.App.1984) (proponent of medical specialist must establish, as necessary foundation for opinion testimony on standard of care applicable to different specialty practiced by defendant, that standards of both specialties were same or closely similar and that witness had more than "casual familiarity" with standard of defendant's specialty); *Alexander v. Mt. Carmel Medical Center*, 56 Ohio St.2d 155, 383 N.E.2d 564 (1978) (in malpractice action against two orthopedic surgeons, expert testimony of podiatrist on standard of care for application and removal of ankle cast erroneously excluded, since proponent of expert testimony established that there was minimum standard of care common to orthopedic surgeons and podiatrists with respect to proce-

dures in question); *Creasey v. Hogan*, 292 Or. 154, 637 P.2d 114 (1981) (orthopedic surgeons were properly qualified to testify on standard of care for podiatric surgery where foundation evidence established that orthopedic and podiatric procedure, practice, and treatment for condition in question were identical or closely similar).

■ There is merit in both of the above approaches. Clearly, when a proper foundation establishes that the expert witness, by reasons of knowledge, skill, experience, training, or education, is so substantially familiar with the standard of care applicable to the defendant's specialty as to assure the court that any opinion will be as well-informed as the opinion of an expert witness practicing the same specialty as the defendant, the expert witness should be permitted to offer an opinion on the standard of care and on whether the defendant conformed to or deviated from that standard. So also, when the medical specialties overlap, with the result that the standard of care applicable to the expert witness' specialty is substantially identical to the specialty of the defendant, the expert witness should be permitted to testify concerning the standard of care applicable to a defendant's specialty and to offer an opinion on the degree of care exercised by the defendant. In our view, therefore, the dispositive consideration in ruling on the admissibility of expert opinion testimony by a medical witness regarding whether the defendant, who practices in another school of medicine, has adhered to or deviated from the requisite standard of care in diagnosing or treating the plaintiff should be the following: (1) whether the testifying expert, although practicing a specialty different from that of the defendant, nonetheless is, by reason of knowledge, skill, experience, training, or education, so substantially familiar with the standard of care applicable to the defendant's specialty as to render the witness' opinion testimony as well-informed as would be the opinion of an expert witness practicing the same specialty as the defendant; or (2) whether the standard of care for the condition in question is

substantially identical for both specialties.[1] If a proper foundation establishes either of these evidentiary predicates for admissibility, the witness should be permitted to offer an expert opinion on the standard of care applicable to the defendant's specialty and on whether the defendant breached that standard of care. On the other hand, absent the proper foundation evidence, the expert witness practicing a specialty different from that of the defendant should not be permitted to offer an expert opinion on those matters.

## III.

The practice of podiatry is defined by statute as "the diagnosis and the medical, surgical, mechanical, manipulative, and electrical treatment of disorders of the human toe and foot, including the ankle and tendons that insert into the foot." § 12-32-101(3), 5 C.R.S. (1985).[2] The practice of medicine, in contrast, includes the diagnosis, treatment, or prevention of "any human disease, ailment, pain, injury, deformity, or physical or mental condition, whether by the use of drugs, surgery, manipulation, electricity, or any physical, mechanical, or other means whatsoever."

Section 12-36-106(1)(a), 5 C.R.S. (1985). Orthopedic surgery is a medical subspecialty that involves the utilization of medical, surgical, and physical methods in treating the extremities, spine, and associated structures, and, as such, includes not only foot surgery encompassed by the practice of podiatry but also other treatments and medical practices not within podiatric practices. 6 *Lawyers' Medical Cyclopedia* § 41.1, at 188 (1977).

The fact that practicing podiatrists and orthopedic surgeons are authorized to perform surgical procedures on a patient's foot is not to say that the standard of care applicable to each discipline is necessarily the same. A patient seeking podiatric treatment is entitled to receive treatment in accordance with the principles and practices of podiatry, rather than some other school of medicine, and a podiatrist rendering treatment to a patient is entitled to be judged by the standard of reasonably careful podiatric practice exercised by members of that specialty, and not by some other school of medicine. *See Klimkiewicz v. Karnick*, 150 Colo. 267, 372 P.2d 736 (1962).

---

1. In 1988, the General Assembly enacted a statutory provision that purports to establish criteria for permitting an expert witness to testify in a medical malpractice action. The statutory provision in question, which was enacted as part of the Health Care Availability Act, applies to acts or omissions occurring on or after July 1, 1988. Ch. 100, sec. 1, §§ 13-64-401 and 404, 1988 Colo.Sess.Laws 612, 620, and 623. The statute is presently codified at section 13-64-401, 6A C.R.S. (1989 Supp.), and states:

   No person shall be qualified to testify as an expert witness concerning issues of negligence in any medical malpractice action or proceeding against a physician unless he not only is a licensed physician but can demonstrate by competent evidence that, as a result of training, education, knowledge, and experience in the evaluation, diagnosis, and treatment of the disease or injury which is the subject matter of the action or proceeding against the physician defendant, he was substantially familiar with applicable standards of care and practice as they relate to the act or omission which is the subject of the claim on the date of the incident. The court shall not permit an expert in one medical subspecialty to testify against a physician in another medical subspecialty unless, in addition to such a showing

of substantial familiarity, there is a showing that the standards of care and practice in the two fields are similar. The limitations in this section shall not apply to expert witnesses testifying as to the degree or permanency of medical or physical impairment.

We express no opinion on the validity of this legislation or on what effect, if any, the statute would have on facts similar to those present here.

2. The statutory definition of podiatry in section 12-32-101(3) also states:

   ... except that "podiatry" does not include the amputation of the foot and the administration of an anesthetic other than a local anesthetic. Surgical procedures of the ankle below the level of the dermis may be performed only in a licensed or certified hospital by a podiatrist licensed in this state who is:.

   (a) Certified by the American board of podiatric surgery; or

   (b) Performing surgery under the direct supervision of a licensed podiatrist certified by the American board of podiatric surgery; or

   (c) Performing surgery under the direct supervision of a person licensed to practice medicine and certified by the American board of orthopedic surgery.

In this case, Doctor Barnard, an orthopedic surgeon, testified that in his opinion the metatarsal osteotomy performed by the defendant did not conform to the standard of care applicable to such a surgical procedure and that the defendant did not adhere to the standard of care applicable to post-operative care and treatment of the plaintiff. We consider separately each aspect of the doctor's opinion testimony.

### A.

The trial court ruled that, because an orthopedic surgeon receives more training and education than a podiatrist, Doctor Barnard was qualified to render an opinion on the standard of care exercised by the defendant in performing the metatarsal osteotomy on the plaintiff's foot. The court of appeals disagreed with the trial court's ruling and held that Barnard's opinion testimony was nothing more than an expression of opinion that the general practice of podiatry did not meet the standard of care observed by an orthopedic surgeon in performing foot surgery. We agree with the court of appeals that the trial court erred in its evidentiary ruling.

■ The plaintiff failed to establish an evidentiary foundation that Doctor Barnard, by reason of his knowledge, skill, experience, training, or education, was so substantially familiar with the standard of care for podiatric surgery as to render his opinion testimony as well-informed as that of a podiatrist. On the contrary, Barnard expressly acknowledged that he was not familiar either with podiatric foot care or with the standard of care applicable to a podiatrist. Under this state of the record, there was no evidentiary basis to accept Barnard, an orthopedic surgeon, as an expert witness on the standard of care applicable to the surgical procedure performed by the defendant and to permit the doctor to express the opinion that the defendant failed to exercise reasonable care in operating on the plaintiff. Nor did the plaintiff establish by way of an evidentiary predicate that the standard of care for a metatarsal osteotomy was substantially identical for both the practice of orthopedic surgery and podiatry. The court of appeals, therefore, correctly concluded that the opinion testimony of Doctor Barnard should not have been admitted on the issue of the defendant's alleged negligence in performing the metatarsal osteotomy in question.

### B.

The plaintiff's malpractice claim was based not only on the defendant's alleged negligence in performing the metatarsal osteotomy but also in the defendant's post-operative care and treatment of the plaintiff. Again, a review of the record reveals that the plaintiff did not establish the necessary foundation for the admission of Doctor Barnard's expert opinion testimony on this aspect of the defendant's conduct.

■ The primary basis for the plaintiff's claim of negligent post-operative care and treatment was the presence of an infection that the defendant failed to adequately treat. The mere presence of an infection following surgery, however, does not establish a *prima facie* case of negligence. *Smith v. Curran*, 28 Colo.App. 358, 472 P.2d 769 (1970). More importantly, although Doctor Barnard testified that there exists a uniform physiological bone healing process and that the diagnosis of an existing bone infection includes a consideration of such symptoms as localized swelling, redness, or drainage, and an analysis of X-rays in the case of suspected osteomyelitis, there was no foundation evidence in this case linking the particulars of Barnard's opinion testimony to the standard applicable to post-operative podiatric care and treatment. The plaintiff, for example, did not establish that Barnard, by reason of knowledge, skill, experience, training, or education, was familiar with the standard of care applicable to podiatric post-operative care and treatment of a metatarsal osteotomy. Nor did the plaintiff establish that the standard of care for treating such a condition is substantially identical for practitioners of orthopedic surgery and po-

diatric surgery.[3]

## IV.

■ Although the trial court erred in permitting Doctor Barnard to offer opinion testimony on the defendant's failure to use reasonable care in the performance of the metatarsal osteotomy and in his post-operative care and treatment of the plaintiff, we believe the proper disposition of this case is not a dismissal of the plaintiff's complaint with prejudice, as ordered by the court of appeals, but a remand of the case for a new trial. In ordering the dismissal of the plaintiff's complaint, the court of appeals reasoned that when Doctor Barnard's opinion testimony was excluded from consideration, the other evidence offered by the plaintiff failed to establish a *prima facie* case of negligence. The plaintiff, however, never had reason to establish an adequate foundation for Barnard's opinion testimony because the trial court simply overruled the defendant's objection and thus admitted the opinion testimony without requiring any further foundation.

If the trial court had sustained the defendant's objections to Doctor Barnard's opinion testimony, as it should have done, the plaintiff might have been able to lay an adequate foundation for at least some of the doctor's opinion testimony. Although Barnard acknowledged that he was not familiar with the standard of care applicable to a podiatric metatarsal osteotomy, he might have been sufficiently familiar with the podiatric standard of care applicable to post-operative care and treatment or might

have been of the view that the post-operative standard of care for a metatarsal osteotomy was identical for both orthopedic surgery and podiatry. Moreover, in the event the defendant's objection had been sustained, the plaintiff might have been able to present an adequate foundation through Doctor McGarry or some other expert witness for eliciting opinion testimony on the issue of the defendant's alleged post-operative negligence. In light of the particular circumstances of this case, we believe the appropriate disposition is to remand the case to the court of appeals with directions to return the case to the district court for a new trial. *See Perreira v. State*, 768 P.2d 1198, 1220–21 (Colo.1989); *Butin v. Rothman*, 135 Colo. 477, 480–83, 312 P.2d 783, 784–86 (1957).

We accordingly affirm that part of the court of appeals' judgment which holds that the trial court improperly permitted an orthopedic surgeon to offer opinion testimony on the standard of care applicable to a podiatrist. We, however, reverse that part of the judgment which orders the dismissal of the plaintiff's complaint with prejudice, and we remand the case to the court of appeals with directions to return it to the trial court for a new trial consistent with the views herein expressed.

---

**3.** Later in the trial, after Doctor Barnard had completed his testimony, the defendant testified that podiatrists diagnose an infection in the same manner as orthopedic surgeons. The defendant also acknowledged that the X-rays relied on by Doctor Barnard for his diagnosis revealed the presence of a lytic area which, according to the defendant, could be symptomatic of osteomyelitis. This testimony of the defendant, however, occurred long after Doctor Barnard had offered his opinions on the defendant's surgical and post-surgical care and treatment of the plaintiff and cannot serve to remedy the foundational defect in Doctor Barnard's opinion testimony.